IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs February 20, 2013

**IN RE ANGEL S. F. ET AL.**

**Appeal from the Juvenile Court for Putnam County**
**No. 1031-TPR    John P. Hudson, Judge**

_____

**No. M2012-02089-COA-R3-PT - Filed March 18, 2013**

_____

The Juvenile Court of Putnam County terminated the parental rights of both parents to their three children on the grounds of substantial noncompliance with the permanency plans and persistence of conditions, and upon the determination that termination of both parents' rights was in the best interests of their children. Both parents appeal. Finding the evidence clear and convincing, we affirm.

**Tenn. R. App. P. R 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

FRANK G. CLEMENT, JR., J., delivered the opinion of the Court, in which ANDY D. BENNETT and RICHARD H. DINKINS, JJ., joined.

Matthew A. Jared, Cookeville, Tennessee, for the appellant, William E. F.[1]

John Milton Meadows, III, Livingston, Tennessee, for the appellant, Angela F.

Robert E. Cooper, Jr. Attorney General and Reporter, Jordan Scott, Assistant Attorney General, M. Anne Austin, and Derek C. Jumper, Nashville, Tennessee, for the appellee, State of Tennessee, Department of Children's Services.

**OPINION**

On November 24, 2009, Angel (born April 2001), Will (born September 2005), and Austin (born December 2008), the children of William E. F. ("Father") and Angela F. ("Mother"), came into protective custody of the Juvenile Court of Putnam County, Tennessee as wards of the court upon a petition by the Department of Children's Services ("the

_____

[1]This court has a policy of protecting the identity of children in parental termination cases by initializing the last names of the parties.

Department"). The children were 8 years, 4 years, and 11 months old, respectively, when the Department became involved. The children were removed from their parents' home due to concerns of negligent supervision, unsanitary conditions, and the parents permitting the children to have regular contact with the step-grandfather, a registered sex offender who lived nearby. On November 30, 2009, the juvenile court entered an agreed order that permitted the parents to retain physical custody, but required the parents to supervise the children, prevent the sex offender from being around the children, and maintain a safe and clean home.

On March 25, 2010, the juvenile court again removed the children from the parents' custody and placed them in the custody of the Department based upon testimony that the home was "environmentally unsafe for the children, especially for the youngest child who has had heart surgery and is on a feeding tube."

Starting in April 2010, the Department developed the first of several permanency plans for each child that required both parents to, *inter alia,* develop parenting skills necessary to assess the environment for safety hazards, correct the hazards and childproof the home, and maintain a clean, uncluttered, safe, and stable home. The plans further required Father to interact appropriately with Will. In October 2010, the Department developed a family permanency plan, which required that the children have age appropriate supervision in the home, constant supervision outside the home, and that the children not be exposed to secondhand smoke. The parents were directed not to smoke in the children's presence or in the home or vehicle, and not to allow anyone else to smoke in the children's presence. Seven months later, the Department developed another family permanency plan that required both parents to actively listen when their children talk to them, to respond to the children's expressions of emotions with empathy, love, and support, and provide age appropriate supervision of the children. The plan also required both parents to intervene when the children engaged in a dangerous activity, required that they provide a safe, appropriate home, that they childproof the home, and that they provide a clean home by cleaning dishes, countertops, and keeping surfaces free of food and drink spills. Throughout this period, the Department provided numerous services to both parents to assist them in meeting their obligations under the permanency plans and remedying the conditions that resulted in foster care, which services are addressed in detail later in this opinion. After several more months passed, the Department determined that both parents were not complying with the plans and the conditions that existed when the children were taken into custody persisted. Therefore, on November 30, 2011, the Department filed a Petition for Termination of Parental Rights of both parents, citing substantial noncompliance with the permanency plan and persistence of conditions.

The case was tried in the Juvenile Court of Putnam County on June 5 and July 17, 2012. On the first day of trial, the juvenile court heard testimony from former landlord Tracy Leptic, former landlord Geneva Bryant, Mother's uncle James Huff, psychologist Dr. William Sewell, and clinical social worker Cara Peacock. Thereafter, on July 17, 2012, the court heard testimony from psychologist Jeffrey Scott Herman, Omni-Vision caseworker Melanie Pykiet, Omni-Vision caseworker Erin Rose, Omni-Vision caseworker Brooke Hall, CASA volunteer Mark Giddings, CASA volunteer coordinator Rita Turnipseed, Omni-Vision team worker Stephen Neely, and Donna Brock, the Department's case manager.

In a final decree of guardianship dated September 27, 2012, the juvenile court terminated the parental rights of Father and Mother to all three of their children. Both parents filed timely notices of appeal.

The parents present the following four issues for our review on appeal: whether the Department exerted reasonable efforts to assist the parents to comply with the permanency plans, whether the Department proved by clear and convincing evidence the grounds of substantial noncompliance with the permanency plans and persistence of conditions, and whether termination of the parents' rights is in the best interests of their children.

### STANDARD OF REVIEW

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *Hawk v. Hawk*, 855 S.W.2d 573, 577 (Tenn. 1993). This right is superior to the claims of other persons and the government, yet it is not absolute. *In re S.L.A.*, 223 S.W.3d 295, 299 (Tenn. Ct. App. 2006).

Parental rights may be terminated only where a statutorily defined ground exists. Tenn. Code Ann. § 36-1-113(c)(1); *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re M.W.A.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). The petitioner has the burden of proving that there exists a statutory ground for termination, such as abandonment or failing to remedy persistent conditions that led to the removal of the child. *See* Tenn. Code Ann. § 36-1-113(c)(1); *Jones*, 92 S.W.3d at 838. Only one ground need be proven, so long as that ground is proven by clear and convincing evidence. *See In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003). In addition to proving one of the grounds for termination, the petitioner must prove that termination of parental rights is in the child's best interest. Tenn. Code Ann. § 36-1-113(c)(2); *In re F.R.R.*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re A.W.*, 114 S.W.3d 541, 544 (Tenn. Ct. App. 2003); *In re C.W.W.*, 37 S.W.3d 467, 475-76 (Tenn. Ct. App. 2000) (holding a court may terminate a parent's parental rights if it finds by clear and convincing evidence that one of the statutory grounds for termination of parental rights has been established and that the termination of such rights is in the best interests of the child).

Therefore, a court may terminate a person's parental rights if (1) the existence of at least one statutory ground is proven by clear and convincing evidence and (2) it is clearly and convincingly established that termination of the parent's rights is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

Whether a statutory ground has been proven by the requisite standard of evidence is a question of law to be reviewed de novo with no presumption of correctness. *In re B.T.*, No. M2007-01607-COA-R3-PT, 2008 WL 276012, at *2 (Tenn. Ct. App. Jan. 31, 2008) (citing *In re Adoption of A.M.H.*, 215 S.W.3d at 810).

## ANALYSIS

The trial court found the Department exerted reasonable efforts to repair and restore the family unit, that the Department clearly and convincingly proved two grounds upon which to terminate Father and Mother's parental rights, and that termination of their parental rights is in the best interests of the children. We discuss each of these below to determine whether the evidence supports the trial court's findings.

## I. REASONABLE EFFORTS

Before we evaluate whether there is sufficient evidence to establish the grounds for termination, we must ascertain whether the Department made reasonable efforts to return the children safely to their home, for this is not a case where reasonable efforts are excused.[2]

"Because of the prominent role that the Department plays in the lives of so many dependent and neglected children, the Tennessee General Assembly has explicitly imposed on the Department the responsibility to make reasonable efforts to reunify children and their parents after removing the children from their parents' home." *In re Tiffany B.*, 228 S.W.3d 148, 157-58 (Tenn. Ct. App. 2007) (citing Tenn. Code Ann. § 37-1-166). The Department's first obligation in this regard is to establish permanency plans, the terms of which are "reasonable and related to remedying the conditions which necessitate foster care placement." *In re Valentine*, 79 S.W.3d at 547 (quoting Tenn. Code Ann. § 37-2-403(a)(2)(C)). This statutory policy does not require that the Department's effort to reunify

---

[2]The Department is not required to make reasonable efforts every time it removes a child. In certain aggravated circumstances, such as severe child abuse, the Department is relieved of this duty. Tenn. Code Ann. § 37-1-166(g)(4); Tenn. Code Ann. § 36-1-113(g)(7).

the family be "herculean"; nevertheless, the Department's employees "must use their superior insight and training to assist the parents in addressing and completing the tasks identified in the permanency plan." *In re Giorgianna H.*, 205 S.W.3d 508, 519 (Tenn. Ct. App. 2006).

Reasonable efforts are statutorily defined as the "exercise of reasonable care and diligence by the department to provide services related to meeting the needs of the child and the family." Tenn. Code Ann. § 37-1-166(g)(1). In cases like this one, the factors that courts use to determine reasonableness include: (1) the reasons for separating the parents from their children, (2) the parents' physical and mental abilities, (3) the resources available to the parents, (4) the parents' efforts to remedy the conditions that required the removal of the children, (5) the resources available to the Department, (6) the duration and extent of the parents' efforts to address the problems that caused the children's removal, and (7) the closeness of the fit between the conditions that led to the initial removal of the children, the requirements of the permanency plan, and the Department's efforts. *In re Tiffany B.*, 228 S.W.3d at 158-59 (citing *In re Giorgianna H.*, 205 S.W.3d at 519).

Although the Department bears a heavy responsibility with regard to reunification, the road to reunification is a "two-way street." *State Dep't. of Children's Servs. v. S.M.D.*, 200 S.W.3d 184, 198 (Tenn. Ct. App. 2006). Parents desiring to be reunited with their children "must also make reasonable and appropriate efforts to rehabilitate themselves and to remedy the conditions that required the Department to remove their children from their custody." *In re Giorgianna H.*, 205 S.W.3d at 519. Accordingly, even though the Department bears a heavy responsibility to facilitate reunification, the Department does not bear the entire responsibility. *S.M.D.*, 200 S.W.3d at 198.

With the foregoing legal principles in mind, we shall now examine the facts of this case to determine if the terms of the permanency plans were reasonable and related to remedying the conditions which necessitated foster care and whether the Department exerted reasonable care and diligence to provide services related to meeting the needs of the parents and children.

The children were removed from their parents' home due to, *inter alia*, concerns of negligent supervision and extremely unsanitary conditions. The parents regained physical custody of the children on November 30, 2009, however, on March 25, 2010, the children were again removed and placed in the physical and legal custody of the Department, where they remain, because the home was environmentally unsafe for the children.

On April 21, 2010, the Department developed separate permanency plans for each child, which required the parents to develop parenting skills necessary to assess the environment for safety hazards, correct the hazards, childproof the home, and maintain a

clean, uncluttered, safe, and stable home. The plans also required Father to interact appropriately with Will. Six months later, the Department developed a "family permanency plan," which required age appropriate supervision in the home, constant supervision outside, and that the children not be exposed to secondhand smoke. Further, the parents were directed to not smoke in the children's presence or in the home or vehicle, and to not allow anyone else to smoke in the children's presence. On May 5, 2011, the Department developed another family permanency plan that required the parents to actively listen when their children talked to them, to respond to the children's expressions of emotions with empathy, love, and support, and to provide age appropriate supervision of the children. The plan also required the parents to intervene when the children engaged in a dangerous activity. The plan further required that they provide a safe, appropriate home, that they childproof the home, and that they provide a clean home by cleaning dishes, countertops, and keeping surfaces free of food and drink spills.

In the interim, the Department provided numerous services to assist the parents in meeting their obligations under the permanency plans and remedying the conditions that resulted in foster care. The Department coordinated and supervised many visits throughout the time the children were in foster care, provided transportation for the children to and from visits, and offered transportation to the parents, which the parents refused to accept. The Department also provided funding for therapeutic visitation, which is a form of visitation where the case worker provides hands-on instruction and training to the parents. Mr. Neely performed therapeutic visitation on thirteen occasions that focused on parenting skills, interacting with the children, cleaning and maintaining a safe home, monitoring the children, and being attentive to them. These visits lasted between two and six hours.

Donna Brock, the Department caseworker, also provided therapeutic visitations; she provided Mother with a booklet describing in simple terms how to maintain a clean home, discussed the contents of that booklet with Mother, and discussed with both parents the necessity of maintaining a clean and safe home and interacting with the children during the visits. The Department also conducted unannounced home inspections, five of which were attempted (unsuccessfully) after the parents stopped cooperating with the Department. The Department coordinated "Child and Family Team Meetings" to develop permanency plans, develop visitation schedules, and discuss parenting issues. The Department also coordinated and funded drug screens for both parents. On two occasions, the Department offered Father alcohol and drug assistance after he tested positive for marijuana in October 2011; however, Father refused these services. The Department also provided two psychological evaluations with Dr. Scott Herman and an additional psychological evaluation with Dr. Sewell. The Department provided reports, court documents, and other background materials to Dr. Sewell for his evaluation. The Department provided funding and transportation for the children to have multiple psychological and educational evaluations performed. The Department

arranged and funded bonding assessments by Dr. Sewell and Ms. Peacock. The Department also helped Mother and Father fill out an application to receive Section 8 housing assistance.

Considering the above facts, other relevant evidence we have not addressed, and the relevant legal principles, we have determined the terms of the permanency plans were reasonable and related to remedying the conditions which necessitated removal of the children from their parents' home and placement of the children in foster care. We have also determined that the Department exerted reasonable efforts to assist Father and Mother to achieve the stated goals.

With the foregoing determinations, we shall now determine whether Father and/or Mother substantially complied with the requirements of the permanency plans.

II. GROUNDS FOR TERMINATION

A. Substantial Noncompliance with the Permanency Plans

A parent's failure to comply with a parenting plan is a ground for terminating the parent's parental rights. Tenn. Code Ann. § 36-1-113(g)(2). In order for noncompliance to justify the termination of parental rights, it must be "substantial." *In re S.H.*, No. M2007-01718-COA-R3-PT, 2008 WL 1901118, at *7 (Tenn. Ct. App. Apr. 30, 2008). The issue of substantial noncompliance with the requirements of a permanency plan is a question of law; therefore, it is reviewed de novo with no presumption of correctness. *In re Valentine*, 79 S.W.3d at 548.

As stated earlier in this opinion, the permanency plans required the parents to develop parenting skills necessary to assess the environment for safety hazards, correct the hazards and childproof the home, maintain a clean and safe home, provide age appropriate supervision in the home, constant supervision outside the home, and assure that the children were not exposed to secondhand smoke. The plans also required the parents to actively listen when their children talked to them, to respond to the children's expressions of emotions with empathy, and to intervene when the children engaged in a dangerous activity.

The testimony by numerous witnesses established that both parents failed to substantially comply with essentially all of the requirements of the permanency plans. For example, the parents consistently failed to maintain a safe home. Mr. Huff testified that the home prior to the children's removal had "always been filthy," despite the fact that the family moved into a newly constructed apartment complex shortly after the juvenile court removed the children, the parents did not keep the home clean until the Department provided in-home therapeutic visitation. While under consistent in-home therapeutic visitation and daily

monitoring, the parents took good care of their home, and as a result the parents were granted unsupervised visitation. However, when the in-home therapeutic visitation ended in November 2010, the condition of the home declined dramatically. Mr. Giddings testified that as early as December 2010, the condition had already begun to deteriorate and that the parents had reverted back to "their old selves." He testified that the kitchen and bathroom floors were covered in trash.

Ms. Brock testified Mother admitted that she could not maintain a clean and safe home when she was not under constant supervision. She also testified that by January 2011, the parents had permitted the home to become extremely cluttered once again, stating there was computer equipment and cords everywhere, including a dismantled computer in the floor and a computer cord hanging dangerously from the staircase, and that carpeting supplies and clothes were piled up in the living room, including a carpet tack strip with protruding nails. She said the parents also left small items on the floor that Austin, a very small child, could get into his mouth. Ms. Brock also stated that a lamp sitting on the floor was plugged into the wall without a bulb in it, thus, it was accessible to the children, who could be electrocuted if they put a finger in the empty socket.

In May 2011, unsupervised visitation was terminated. By June 2011, caseworkers were having trouble gaining access to the home; as a result, on October 27, 2011, the juvenile court ordered an inspection of the home. Ms. Turnipseed testified that during this court-ordered visit the apartment was in "disarray" and that it was "very smelly" and "dirty." She also testified that there was "a lot of junk . . . all over the living room," that the kitchen floor was "nasty," and that there was half an inch of dried food on a table; there was also food sitting in the floor, trash was "piled up in the kitchen," and there was "trash everywhere." Bottles, clothes, and odds and ends, including cat litter boxes, were "everywhere." She said there was an "array of cords and computer parts" throughout the home, including cords hanging dangerously from the staircase. There was no place for the children to eat due to the amount of dirty dishes and other items "strewed all over the counter." She concluded that the home was "very unsafe for the children."

After the court-ordered inspection, the parents moved into a mobile home without notifying the Department. When the Department located the mobile home, it attempted to visit the mobile home on at least five occasions, but the parents did not answer either the front or the back door. On at least one occasion, the caseworker heard people talking inside and their van was parked outside, but the parents still did not open the door. Additionally, the parents had covered their windows with aluminum foil. Even though the parents were informed of the need to allow the Department to visit the home and were given advance notice of an inspection on at least one occasion, caseworkers were never able to gain access to the parents' mobile home following the court-ordered visit on October 27, 2011.

The safety concerns in the parents' home were amplified by the lack of supervision by the parents. Austin was less than a year old when the Department became involved in this case, was medically fragile, and at times put small objects into his mouth. Will was diagnosed with ADHD and asthma, and needed "very consistent supervision." Angel demonstrated sexually reactive behavior, she had been exposed to pornography, and she had "sexual encounters" with her brothers in the parents' home prior to removal. Other salacious incidents, which need not be recited, created a need for close monitoring of Angel's behavior to protect her from inappropriate sexual activity and outside sexual predators.

Despite these needs, the parents' supervision of the children was grossly inadequate. Dr. Sewell testified that the parents did not monitor or discipline the children, but instead allowed them to get out of sight and engage in dangerous activities. Ms. Brock testified that Mother never disciplined the children and the majority of the time did not provide supervision. Instead, Angel, the oldest child who had her own challenges, was expected to parent her brothers. Ms. Turnipseed noted specifically that the parents did not monitor the children when they were outside.

Mr. Neely testified that in another incident, while Austin and Will were "running off" in different directions, Angel, who had shown sexual reactive behavior, was surrounded by older boys at the basketball court. Mr. Neely "repeatedly" reminded Father to watch the children but Father failed to do so.

Ms. Brock also testified that the parents failed to supervise Austin,when he was three years old, as he went up and down the staircase; she also stated they failed to consistently close the baby gate to prevent him from climbing the stairs alone. Mr. Giddings testified that a fall for a child of his size could cause serious injury. Moreover, on one occasion while going up and down the staircase, Austin had a computer cord wrapped around his neck. Ms. Brock testified that if he had fallen while wrapped in the cord, he could have choked to death.

The parents' refusal to supervise and properly parent their children posed other health risks to the children. For example, Ms. Hall testified that even though both parents were present, Angel had to take on the parenting role when Will, who has asthma, was in need of a breathing treatment, and Angel administered the treatment. Ms. Hall also testified that on several occasions Austin would stand on a chair and despite the fact both parents' were present, it was Will who instructed Austin to not stand on the chair.

Both parents were also minimally responsive or totally unresponsive to the children on numerous occasions. Dr. Sewell testified that Father was emotionally detached, aloof, and isolated. Ms. Peacock testified that Father was at times unresponsive to the children, "and

at other times would respond only after a long delay, or only very minimally." Ms. Pykiet testified that Father was not involved with the children other than "very limited" interactions. He would only interact with Angel when she would discuss adult topics like computers or television shows. Ms. Turnipseed likewise testified that Father "would totally ignore" the children.

Likewise, Mother had limited interactions with the children. Ms. Pykiet testified that Mother talked with the kids "limitedly." She noted one visit where she did not "really engage with the kids at all." Dr. Sewell testified that Mother had a lack of attachment with the children and "took very little part in interacting with the children." She also did not take part in the general play activities during the visits. Dr. Sewell further testified that she did not show the children affection and did not appear to be emotionally involved with them. Ms. Hall also noted that there was a lack of affection between Mother and the children.

Ms. Peacock, who began working with the family in September 2011, cited as an example of this behavior an incident where Austin came up to Mother very animatedly saying: "Mommy, Mommy, Mommy!" After Mother failed to respond, he approached Father animatedly saying: "Daddy, Daddy, Daddy!" Father did not respond so Austin climbed into his lap and got within inches of his face and again called out: "Daddy, Daddy, Daddy!" Only then did Father respond by saying: "What Austin?" In another instance, Father did not respond to Will after Will animatedly told him a story. Ms. Peacock recounted yet another incident where Will asked his father for a jump rope, but Father did not respond.

Ms. Turnipseed related another instance where Angel approached Mother to play ball with her. Mother "never even looked at her and just sat the ball down." She then "crossed her arms and turned around to look away from her." Mother "wouldn't even speak."

The parents also showed a lack of interest in the children's health. Ms. Turnipseed recounted one instance where the parents listened to a report from the doctor regarding the children. Father did not respond at all. Mother responded with a shoulder shrug.

Dr. Sewell and Ms. Peacock, both of whom performed a bonding assessment, stated the lack of attachment was detrimental to the children. Ms. Peacock asked the children how this unresponsiveness made them feel. Will drew a sad face and covered the page with tears. Angel wrote the words "stomp stomp stomp" all over the page and stated that it made her angry. Ms. Peacock testified that the parents' unresponsiveness was harmful to the children's self-esteem, prevented the children from having their needs met, was emotionally detrimental to the children, and may cause serious concerns in adulthood. Dr. Sewell testified that their unresponsiveness and emotional detachment rendered both parents unable to adequately parent the children.

Dr. Sewell also diagnosed Mother with borderline personality disorder, a disorder that often requires the assistance of a specially trained psychologist. However, based on Mother's history, Dr. Sewell opined that she was not amenable to treatment because she would not go to counseling or would drop out. While borderline personality disorder would not prevent Mother from adequately parenting her children, Mother's emotional detachment from the children did.

In addition to their failure to maintain a safe and sanitary home and properly parent the children, Father also failed to comply with the provisions of the permanency plans regarding smoking. Testimony indicated that Father smoked in the children's presence even though the children had upper respiratory problems and Will had asthma. Will's doctor ordered that he not be around cigarette smoke or in any place where smoking had taken place. Caseworkers also discussed the need for Father to not smoke around the children due to their health issues. Nevertheless, Ms. Brock found a lit cigarette in an ashtray in the kitchen upon arriving with the children for a supervised visit. Ms. Brock also testified that Father would smoke in the van immediately prior to allowing the children to get inside. Other testimony indicated that the home smelled of smoke and that Father would smoke in Will's immediate vicinity outdoors. In one such incident in February 2012, Mother did not do anything to make him stop smoking. The smoke caused Will to cough "to the point where [he] almost threw up."

Considering the entire record before us, the evidence clearly and convincingly established that both Father and Mother failed to substantially comply with the terms and conditions of the permanency plans. Thus, the statutory ground of failure to substantially comply with a parenting plan as set forth in Tennessee Code Annotated § 36-1-113(g)(2) has been established by the requisite proof. We therefore affirm the trial court's finding that Father and Mother failed to substantially comply with the requirements of the permanency plan.

Parental rights may be terminated when one statutorily defined ground is established. Tenn. Code Ann. § 36-1-113(c)(1); *Jones*, 92 S.W.3d at 838; *In re M.W.A.*, 980 S.W.2d at 622. Nevertheless, we shall address the second ground found by the trial court, that of persistent conditions set forth in Tennessee Code Annotated § 36-1-113(g)(3).

## B. PERSISTENCE OF CONDITIONS

Tennessee Code Annotated § 36-1-113(g)(3) specifies the essential elements for the "persistent conditions" ground for termination of parental rights. It provides that grounds for termination exist when:

(3) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

(A)   The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) . . . , still persist;

(B)   There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) . . . in the near future; and

(C)   The continuation of the parent . . . and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home; . . .

*Id.*

The evidence in this record, which we summarized earlier, clearly and convincingly established that Father and Mother made no material changes to the conditions that existed when the children were removed, that there is little likelihood that these conditions will be remedied at an early date so that the children may be safely returned to either parent in the near future, and that the continuation of the parent and child relationship greatly diminishes the children's chances of early integration into a safe, stable, and permanent home. For these reasons, we affirm the trial court's finding that the Department proved the "persistent conditions" ground for termination of Father and Mother's parental rights by clear and convincing evidence under Tennessee Code Annotated § 36-1-113(g)(3).

In addition to proving one ground for termination, the petitioner must prove that termination of parental rights is in the children's best interests. Tenn. Code Ann. § 36-1-113(c)(2). Therefore, we shall determine if the record provides clear and convincing evidence to establish that termination of Father and Mother's parental rights is in the best interests of the children. *See In re C.W.W.*, 37 S.W.3d at 475-76.

## II. BEST INTEREST OF THE CHILDREN

The Tennessee General Assembly has provided a list of factors for the court to consider when conducting a best interest of the child analysis. *See* Tenn. Code Ann. § 36-1-113(i)(1)-(9). The nine statutory factors, which are well known and need not be repeated here, are not exclusive or exhaustive, and other factors may be considered by the court. *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). Moreover, not every statutory factor

need apply; a finding of but a few significant factors may be sufficient to justify a finding that termination of the parent-child relationship is in the child's best interest. *See In re M.A.R.*, 183 S.W.3d at 667. The child's best interest is to be determined from the perspective of the child rather than the parent. *See State Dep't of Children's Servs. v. L.H.*, No. M2007-00170-COA-R3-PT, 2007 WL 2471500, at *7 (Tenn. Ct. App. Dec. 3, 2007) (citing *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004)).

At the time of the termination hearings, the children were in an adoptive foster parent home. Ms. Turnipseed testified that the children respected and listened to their foster parents. They did not fight with the foster parents, and were obedient to them. The foster parents provided "excellent" oversight of the children, which helped the children to feel comfortable in the home. The foster parents were also "really good about listening to the children." Ms. Brock also testified that the children were comfortable in the home and interacted as a family with the foster parents and their children. She testified that the foster home was safe and appropriate. Further, the evidence clearly and convincingly established that both Father and Mother failed to make any adjustment in circumstance to make their home safe for the children. *See* Tenn. Code Ann. § 36-1-113(i). To allow the children to return to the care and custody of Father or Mother, which could not be considered until they made substantial and material positive changes toward becoming responsible parents, which both parents have repeatedly failed to do, would subject the children to more uncertainty and instability. *Id.* Moreover, to return the children to either parent would require the removal of the children from an environment where they are happy, healthy, and thriving. *Id.*

Considering these relevant factors from the children's perspective, the evidence clearly and convincingly established that it is in the children's best interests that Father and Mother's parental rights be terminated. Therefore, we affirm this finding as well.

### In Conclusion

The judgment of the trial court is affirmed, and this matter is remanded with costs of appeal assessed against the Department of Children's Services due to the parents' indigency.

_____
FRANK G. CLEMENT, JR., JUDGE

-13-